| | | |
|---|---|---|
| SHANE JERMAINE MATTHEWS | § | |
| VS. | § | CIVIL ACTION NO. 1:15cv286 |
| DIRECTOR, TDCJ-CID | § | |

## MEMORANDUM OPINION

Petitioner Shane Jermaine Matthews, an inmate confined within the Texas Department of Criminal Justice, Correctional Institutions Division, proceeding *pro se,* filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### Factual Background

In 2010, an indictment was returned in the First District Court of Jasper County, Texas, charging petitioner, his brother, John Matthews, and David Haywood with capital murder. Following a joint trial, the co-defendants were convicted of the offense with which they were charged. Petitioner was sentenced to life imprisonment without the possibility of parole. The conviction was affirmed by the Texas Court of Appeals for the Thirteenth District. *Matthews v. State*, No. 13-12-00052-CR, 2013 WL 3894005 (Tex.App.–Corpus Christi July 25, 2013). The Texas Court of Criminal Appeals refused a petition for discretionary review. *Matthews v. State*, PD-1130-13.

Petitioner subsequently filed a state application for writ of habeas corpus. The Court of Criminal Appeals denied the application without written order on the findings of the trial court without a hearing. *Ex parte Matthews*, No. WR-82,430-01.

### Evidence at Trial

In its opinion, the intermediate appellate court described the evidence at trial as follows:

Miesha Kelly first told the jury that she was under indictment for the capital murder of Palomo. According to her testimony, she did not have any agreement with the State concerning her testimony, but she decided to testify truthfully and hoped to avoid a life sentence. She also testified that she had a prior forgery conviction.

Kelly testified she had known John, who also goes by "John Boy," since 1999. They

had a daughter together and, at the time of the murder, they lived in Galveston, Texas. She had known Shane since 2007 and David since early 2000. Kelly identified John, Shane, and David in open court.

On December 13, 2009, Kelly, John, Shane, and David drove from Galveston to Kirbyville, Texas, in a gold Equinox sports-utility vehicle ("SUV") that belonged to David's girlfriend. John and David told her that morning the purpose of their trip was to buy marihuana and a car. During the drive, they smoked marihuana and they also stopped at a gas station in Baytown, Texas. At that time, David was driving the SUV. Kelly's cousin, Jason Brown, Melissa Adams, and Brown and Adams's minor daughter were at the gas station.

When they left the gas station, Kelly drove and followed Brown, who was leading them to meet the man who had the drugs for purchase. After stopping at a carwash in Kirbyville, Kelly and appellants drove to the convenience store next to the Gateway Motel in Kirbyviille. Kelly pulled up to the gas pump, David got out of the SUV to pay for the gas and he bought a can or soda and a bag of chips.

Kelly then drove appellants to the motel and parked in front of a room. There was already a car parked directly in front of the door to the room. Brown, Adams, and their daughter were outside the car. Kelly exited the Equinox and went into the motel room to use the restroom. Appellants were still in the Equinox. When Kelly entered the room, there was no one else in the room, and she did not recall anything being on the back of the toilet. Kelly did not see a drink or bag of chips in the bathroom.

When she exited the bathroom, Brown and appellants were all inside the motel room. A clerk from the motel called and told Brown there were too many people inside the room. Kelly was going to leave and return to Galveston.

Kelly was standing in the doorway of the motel room, leaving, when Palomo pulled up in a gray or blue Cadillac and parked in front of the doorway. She remembered a woman wearing a red shirt seated in his car. Kelly entered the Equinox and drove away. Soon after, Shane used the walkie-talkie feature of her cell phone and told Kelly to return to the motel. When she returned to the motel, Palomo was lying in front of the motel room and the girl from the Cadillac was coming out with a towel trying to help him

Kelly did not see Brown. She also did not see appellants, but they were still talking to her via the walkie-talkie feature on her phone. When she saw appellants, they were running from the side of a house on the street just south and behind the motel. Kelly picked them up, and they drove back to Galveston. According to her testimony, she was not told she would be the driver of a "get away car" and she did not know of any plan to commit a robbery.

Kelly testified further that John was dressed in a black hood. David was wearing a black hood with some Dickey-brand shorts. Shane was wearing a white thermal shirt, jeans, and gloves. Kelly described their clothes as baggy and as "hoodie" jackets.

As they were leaving Kirbyville, they passed some police officers with their lights and sirens on. Shane told Kelly to keep going. Shane threatened her. As they drove back to Galveston, Brown called asking where they were, and said he was stuck at

the store. Later, Brown called again and told Kelly to dispose of her phone and to get a new phone number.

As they drove, Kelly said that Shane and David talked about shooting Palomo. Shane said he shot Palomo in the back before he went out the window. David said he also shot Palomo. Shane talked about duct tape, and asked David why he did not duct tape Palomo. David said he did, but that Palomo broke loose. Kelly testified that John and Shane also talked about cleaning the car. John was quiet and did not talk to her about the incident while they were driving. Later, John did not tell her anything about a robbery, but he apologized to her for what had happened. She described John as "not shocked or surprised," but nervous.

On the drive back to Galveston, John and David threw out their undershirts. Kelly later took an investigator to the area where the shirts were thrown, but to her knowledge, nothing was found. Once they were back in Galveston, Kelly saw two small guns. Shane had one of the guns, and John gave Shane the gun he had. At least one of the guns was wrapped in clothes. Kelly saw that Shane wore gloves when he exited the car with the guns in Galveston. Up to that point, Kelly had not seen Shane wearing gloves. Kelly testified she did not know that they had the guns when they were driving to Kirbyville. She also did not see duct tape or masks.

In Galveston, they first dropped off Shane. David they dropped Kelly and John off at their house. Rather than returning to their own home, Kelly and John had a woman rent them a motel room in Galveston. Kelly testified that Galveston police arrested them the following morning and that they were taken to the Jasper County Jail. Kelly testified that she gave a false statement to the police in which she talked about a fourth man nicknamed "North Carolina," but that she had invented this person because she was scared.

Kelly testified that she is familiar with John's handwriting, and she identified State's Exhibits 64 and 65 as two letters he wrote and sent to her at the jail. When she received these letters, she gave them to her attorney, who then gave them to the District Attorney. In State's Exhibit 64, dated May 14, 2010, John wrote that he needed to "get out to get them tools." Kelly testified that John's reference to "tools" in the letter was about the guns. John also wrote in the letter that he hoped she had not said anything about the "spot," because that is where "dumb took the tools, not swimming." Kelly testified the "spot" was a place where John and Shane hung out. Kelly understood the statement "not swimming" to mean that the guns had not been thrown into the water. John also asked that she please keep her mouth shut about the "spot," and that he really needed her. In State's Exhibit 65, dated May 18, 2010, John again asked Kelly to please keep her mouth shut about the "spot."

When confronted with an earlier statement she made to the police, Kelly affirmed that Shane said he thought Palomo had a gun, or was reaching for a gun, or something; that appellant wrestled with Palomo; and that Shane said he shot Palomo in the back when Palomo was trying to get away by jumping out the window. In discussing her prior statements, Kelly testified that appellants were wiping their hands and faces after the incident. John had blood on his mouth, and appellants got blood all over the stereo and the seat belts of the car.

Jason Dayton Brown testified that he was 32 years old, that he lived in Houston, Texas, and that Melissa Adams was his girlfriend. Brown had know Palomo since

he was 14 or 15 years old. Kelly is his cousin and John was Kelly's boyfriend. Brown identified John in court and testified that he had known John for at least five years. Brown also identified Shane and David at trial. Brown testified that he did not go into the motel room with appellants, and denied that he came out of the room after Palomo crashed through the window. Instead, Brown testified as follows.

In the latter part of 2009, John, whom Brown also knew as "John Boy," talked to Brown about buying some marihuana. They did not discuss specifics, but John said that he and his brothers "hit a lick" for $40,000, and asked if Brown knew where they could get some drugs. Brown then called Palomo, because he was a known drug dealer. Palomo said he had 100 pounds of marihuana and the price was $900 a pound. As the middleman, Brown was supposed to receive $100 for every pound sold. Brown then called John, and they arranged to meet Palomo in Baytown. When that meeting did not work out, Palomo asked if they would come to Kirbyville.

On December 13, 2009, Brown, Adams and their daughter left Houston and drove to Kirbyville. They stopped at a gas station in Baytown on the way. Kelly, John, and his two brothers, Shane and David, were in a gold SUV at the gas station. They followed Brown and Adams from the gas station in Baytown to a car wash in Kirbyville. Brown exited his car and spoke with John at the car wash in Kirbyville.

Afterwards, Brown drove Adams and his daughter to the Gateway Motel where Adams rented the motel room. Kelly and appellants did not immediately follow Brown and Adams to the motel. Adams rented the room using Brown's debit card and gave him the room key. Adams and her daughter left for a family event, as Brown headed for the motel room. When Adams left, neither appellants, Kelly nor Palomo was as the motel.

Brown understood that the marihuana deal was going to happen in his motel room. Three or four minutes after Adams left, Palomo pulled up driving a dark blue Cadillac STS sedan. Palomo parked right in front of the motel room and Brown could see that he had a woman in the car. Palomo exited his car, and went into the room with Brown to wait. There was no one else in the room and it was clean–there was no evidence that a prior occupant of the room had left any belongings in the room. A clerk from the front office of the motel called the room and told Brown that only one person was supposed to be in the room, so they went back outside and stood at the back of Palomo's car. On cross-examination, Brown acknowledged that a registration ticket from the motel (included in State's Exhibit 1) stated "TWO PERSONS PER ROOM[.] NO VISITORS", and that according to his testimony, the motel clerk called when there were only two people in the room.

Although Palomo never showed Brown the marijuana, he was not concerned. According to Brown, If Palomo said he had marihuana, then he had some. Appellants and Kelly then drove up to the motel and pulled in behind Palomo's car. The three men exited the SUV and Kelly drove off. Appellants followed Palomo into the room, and Palomo asked Brown to stay outside with the woman in his Cadillac. Brown gave Palomo the room key and then entered the driver side of the Cadillac. Palomo did not have a bag or other container with him when he went into the room. Appellants did not appear to have a bag or container with them either. Brown recalled appellants wearing dark, baggy clothing, but did not recall any "hoodies."

4

Inside the Cadillac, Brown and the woman made small talk and played with Palomo's small dog, while Palomo and appellants were inside the motel room. As far as he could tell, they were the only ones in the room. Brown doubted anyone could have entered or existed the motel room without his notice because he was very near the door while he waited in the Cadillac. Brown did not know the woman in the Cadillac; the windows were up, the engine was running. He did not recall if the radio was playing. He did not see or smell anything that made him believe there was marijuana in the car. He waited in the Cadillac "no longer than ten minutes."

Something then went wrong inside the motel room. Palomo "fell through" the room's glass window. Palomo's shirt was off. As soon as Brown saw this, he jumped out of the car, and saw two "guys" with pistols run out of the motel room with hoodies or ski masks on their heads. Brown turned and ran for the nearby store where he hid on the side of the store. He did not see a third man, and could not tell who the two men were. He deduced it had to be two of the appellants because only the appellants were inside the room with Palomo at the time. The two men with guns ran towards the highway, but Brown could not say where they went after that.

Brown then saw Deldrick Minter driving past him. He did not see Kelley, her car, nor appellants again at the scene. Brown called a friend, Alvin Booker, to come get him, and he went to Booker's house in Magnolia Springs, Texas. He called Adams and, although he did not tell her what happened at the motel room, he did tell her to report her purse stolen because the room was rented in her name. He did not want her to get into trouble when she was not involved with the incident. About two hours later, Brown called Kelly and John, and asked Kelly what "they" wanted him to do. A voice in the background said, "Don't worry about it, you didn't do anything. Don't say nothing."

Brown knew the police were looking for him, so he told his father where he was, and the police came to get him. That night, Brown gave the police a statement. He was arrested for conspiracy to deliver marihuana and placed in the Jasper County Jail. Brown testified that he is familiar with appellant's voices, and that while he was in the jail, he heard Shane speak through the vents and refer to "sticking to the script."

On cross-examination, Brown admitted that he initially lied to the police and even claimed to know nothing about the events surrounding Palomo's death. Brown also admitted that it was his understanding the State would dismiss the charge against him if he offered truthful testimony.

Melissa Adams testified that she was in a twelve-year relationship with Brown and that they considered themselves married. They had a daughter together. Adams testified that on December 13, 2009, Brown drove her and their daughter from Houston to Kirbyville for Adams's father's birthday party. On the drive, they stopped at a gas station in Baytown where they "met up with" a gold SUV. Although shee did not know their names, Adams identified appellants, John, Shane, and David, as three of the people who were in the gold SUV. Brown's cousin, Kelly, was also in the gold SUV. Adams believed that she was driving. Adams testified that she and Brown did not get gas at the gas station in Baytown, and that she was not sure why they stopped. She did not recall anyone getting out of the cars. When she asked Brown why they stopped, he just shrugged it off. Adams testified that to her knowledge, the meeting at the gas station was not a pre-arranged meeting.

After the two cars "met up," Adams said they drove to Kirbyville. The four people in the gold SUV followed. Adams estimated the trip from Baytown to Kirbyville took about an hour and a half. She fell asleep about 30-45 minutes into the drive; the other car was behind them during the time she was awake. When Adams asked Brown about the people in the other car, he told her not to worry about it. On the drive to Kirbyville, she did not hear Brown on the phone with Palomo or anyone; she had fallen asleep.

When Adams awoke, she, Brown, and their daughter had arrived at the Gateway Motel in Kirbyville. Adams went to the motel's office, rented a room and paid with Brown's debit card. She rented the room for her, Brown, and their daughter to spend the night. They did not unload their belongings because she was going to get ready for the birthday party at her parents' house. They went to the motel because Brown was not going to the party. Adams identified the receipt from the motel room and her signature on it. The receipt was admitted into evidence as part of State's Exhibit 1. It is dated December 13, 2009 and shows a time of 14:22:44.

Adams told the jury that Brown stayed at the motel while she and their daughter drove to her mother's home for the party. As they left the motel, she did not recall any other cars or people standing outside their room. Although she and Palomo were friends and former classmates, she did not see him at the motel before she left. No one was there but Brown, and he was headed into the room. Adams was not present when any altercation occurred at the motel. Less than an hour after she left the motel with their daughter to go to her mother's house, Brown called and told her that something bad had happened at the motel. Adams left her daughter at her mother's house. She then invoked her right against self-incrimination and would not state where she went next.

When asked whether she had any criminal charges against her "stemming from the death of Mr. Palomo," Adams answered, "Yes." Adams acknowledged that she was charged with conspiracy to deliver marihuana and making a false report to a police officer stemming from this investigation, and that her attorney on those charges was in the courtroom. Despite her pending criminal charges and having previously met with the prosecutor, Adams testified that she did not have an agreement with the District Attorney concerning her testimony.

Euretha Wagner lived in Beaumont, Texas and was dating Palomo who lived in Bleakwood, Texas with his parents. On December 13, 2009, she and Palomo drove to the Gateway Motel in Kirbyville. Wagner testified that she and Palomo were going to get something to eat. She did not know that he was going to stop at the motel. At the time, Wagner was twenty years old and Palomo was twenty-seven or twenty-eight. Wagner had heard that Palomo dealt drugs.

When they arrived at the Gateway Motel, Palomo parked in front of the door of the motel room. It was the second motel room from the road. Palomo left the car, a Cadillac STS, running. A gold SUV was also there. Wagner did not see anybody in or around the gold SUV. Once Palomo pulled in, a man Wagner later learned to be Jason Brown exited the motel room and had a short conversation with Palomo outside the Cadillac. Wagner did not hear the men's conversation.

Palomo and Brown then entered the motel room. Wagner then saw Brown come out of the room followed by a big woman with short hair. The woman got into the gold

SUV and drove away. Brown got into the driver's side of Palomo's Cadillac. Wagner "did not know what to think" of Brown sitting in the Cadillac with her. It scared her. Brown never told her why he came and sat with her, but after making some small talk he commented, "I don't know what's taking JJ [Palomo] so long." Brown also mentioned something to her about "counting money."

Wagner testified that she did not see or smell marihuana in the car and did not know why Palomo went to the motel. Wagner denied knowledge of a drug deal. While she waited in the Cadillac with Brown, Wagner did not see anyone else exit or enter the motel room. Wagner testified no one else could have entered or exited the motel room without her noticing it.

Wagner then saw Palomo crash through the motel room window. Brown exited the Cadillac, as did Wagner, and she went to help Palomo. Wagner did not see where Brown went. Brown did not try to help Palomo. Wagner did not see where Brown went. Brown did not try to help Palomo. Wagner then saw three "guys" run out of the motel room wearing "black hoodies with black masks over their faces." The three individuals went to the left and behind the motel. On cross-examination, Wagner testified that she did not hear any gunshots or see any guns. She also testified that she could not be sure whether the three individuals who ran from the room were men or women, because she could not see their faces.

Wagner knelt beside Palomo who was not responding, breathing, or moving. She saw blood and ran into the room to get a towel to put on Palomo's wounds. She noticed Palomo's pants were pulled down to his ankles, his shirt was off, and, as she later learned, his hands were tied in front of him. She did not believe he could be revived.

At that point, Deldrick Minter drove up. Wagner asked him to call 911. She then called her friend Charles Beatty because he was the first person who came to her mind. Beatty came to the motel and, after seeing Palomo, ran into the hotel room and got a comforter to cover Palomo. Beatty said he needed to get Palomo's father. They they drove Palomo's Cadillac to Palomo's parents' house in Bleakwood. They found Palomo's parents and told them what happened. Wagner called her mother and a cousin to ask them to take her back to the motel, where she talked to police. Wagner testified that, out of fear, she initially gave the police conflicting statements, but that she later decided to tell the truth.

At trial, Wagner identified State's Exhibit 13 as a picture of Brown and State's Exhibit 14 as a photograph of the woman who drove away from the motel in the gold SUV. Wagner was not able to identify appellants as the three people she saw run out of the motel room because she did not see their faces.

Deldrick Minter testified that he was 22 years old and lived in Kirbyville. During the afternoon of the murder, Minter was at "Johnny's Stop 'n Stay" store and gas station pumping gas when he heard glass breaking and saw Palomo fall through a motel room window. He then saw three people, all in black, run out of the motel room, turn left, run around the building, and behind the motel. Minter could not tell if they were men or women because of the way they were dressed. He could not see their faces and he did not see the three people again after they ran behind the building.

Minter then saw Brown walk out of the motel room towards the Johnny's Stop 'n Stay where he "caught a ride." Minter did not see Brown again. Minter testified that, right about the same time or a little after, a woman he knew as Lakesha Wagner drove up in front of the motel room in a Cadillac. By the time Minter drove over to the motel parking lot, Wagner had a towel and was getting blood off of Palomo. No one else was around, and the door to the motel room was open. Minter said no one went into the room while he was there. Minter did not touch Palomo, but got close to him, and asked him if he wanted an ambulance. Palomo lifted his head but never said anything. Minter called 911. The police arrived at the scene about twenty minutes later.

Dr. Tommy Brown testified he is a forensic pathologist, board certified in anatomic clinical and forensic pathology, and licensed by the State of Texas to practice medicine. Dr. Brown has performed more than 15,000 autopsies during his career and testified as an expert in forensic pathology on many occasions. Without objection, the trial court designated Dr. Brown as an expert witness.

On December 14, 2009, Dr. Brown performed Palomo's autopsy. A copy of his autopsy report was admitted as State's Exhibit 2. In his report, Dr. Brown described Palomo as being 73 inches tall, weighing 300 pounds, and having shorts and trousers pulled down around his knees. He specifically noted that there was no personal property on or accompanying his body.

Dr. Brown identified State's Exhibits 3 through 11 as photographs of Palomo taken during the autopsy. Using the photographs, Dr. Brown identified and discussed Palomo's numerous injuries including a number of lacerations to the top and back of his head, some of which extended down to the skull bone. Dr. Brown explained that a blunt-force object, such as the butt or barrel of a pistol, could have caused the lacerations. Through State's Exhibit 10, Dr. Brown described a large, very irregular laceration to the back of Palomo's head that measured 2 3/4 inches and was consistent with having been caused by a gun barrel. Dr. Brown found other cuts and lacerations over and between the knuckles and on the back side of Palomo's right hand, possibly caused by going through plate glass. He also noted other abrasions or superficial scratches on the right thigh possibly caused by going through a window.

Dr. Brown discussed Palomo's two gunshot wounds. The first gunshot wound was to Palomo's right upper arm, about nine inches below his shoulder, where he recovered a small, possibly .22 caliber bullet. The second gunshot wound was to Palomo's mid to low back area. Dr. Brown explained that this bullet traveled back to front, slightly upward, through the lung, and was ultimately recovered from Palomo's chest cavity. Dr. Brown's report described this bullet as being medium to large caliber.

Dr. Brown testified that Palomo's cause of death was the gunshot wound to his back and that the manner of his death was a homicide. Dr. Brown documented the physical evidence he recovered during the autopsy, including Palomo's clothing and the two bullets.

Gerald Hall worked for the Jasper Police Department, and had received basic and advanced certifications in forged and questioned documents. In the past, he has been asked to compare known and unknown handwriting samples, and testified on several

occasions, including as an expert witness in the courts of Jasper County.

Hall identified State's Exhibits 61 and 62 as two of the known writing samples from John that he used for comparison to the questioned document he analyzed in this case. Altogether, he was provided thirty-six samples of John's handwriting. He described the process by which he compares the handwriting samples: comparing the signature, the speed, the height, the curvature of the strokes, the ends, and a whole variety of characters. He identified Sttate's Exhibits 64 and 65 as two letters that he analyzed to determine if John wrote them. Based upon his comparison with John's known writings, Hall testified that John wrote the two letters. State's Exhibits 64 and 65 were admitted into evidence.

At the time of trial, Officer Constance Jordan had been a certified police officer for six-and-a-half years, and was a crime scene officer with the Jasper Police Department. She received advance crime scene training, and her duties included processing and collecting evidence at crime scenes.

On December 13, 2009, Officer Jordan was dispatched to the Gateway Motel at approximately 4:30 p.m. The crime scene was in Room 1 of the motel. There, she found a body covered with a bed spread, right outside the room's window. The window was broken and the door to the room was open. She identified State's Exhibits 17 through 29 as photographs of the scene.

Using the photographs, Jordan explained that State's Exhibit 19 showed the victim having gone face first out the motel room window. State's Exhibit 21 showed the victim's shirt wrapped around both of his arms and duct tape wrapped around one of his arms. There was more duct tape found outside the room on the wall of the motel toward the highway. On cross examination, Officer Jordan further described the photo of Palomo's right wrist with the silver duct tape. She explained that while there was duct tape there, the arms appeared wrapped in the victim's shirt. The duct tape was wrapped over the clothing, not the skin, and her first impression was that it did not look like the victim's hands were bound or tied together with the duct tape. She said that the other pieces of duct tape they found outside the room looked like they had been pulled and torn.

Officer Jordan testified that the motel room was in disarray, with a table and chair overturned and a significant amount of blood on the walls. She took blood samples from various areas of the crime scene for later DNA testing. She testified that State's Exhibit 29 showed the bathroom where she found a Doritos bag and a soda can sitting on the back of the toilet. Officer Jordan described State's Exhibit 34 as showing a twenty-dollar bill recovered from the floor in the open doorway of the motel room. State's Exhibit 38 was a photo that showed a clothing button found next to the twenty-dollar bill. State's Exhibit 39 showed a small broken piece of a gold chain officers recovered in the parking lot just outside the room.

Officer Jordan described a green nylon bag recovered in the motel bathroom. When she looked in the bag, she found rubber gloves. State's Exhibit 41 showed a roll of duct tape found right in front of the dresser in the motel room. State's Exhibit 42 showed a piece of duct tape found outside the motel room. Officer Jordan testified that this piece of duct tape was outside the room's front door, to the left and around the building toward the highway. This piece of duct tape was silver colored as was the roll of duct tape recovered in the room.

At the time of trial, Curtis Frame was a Captain with the Jasper Police Department and had been a certified police officer since 1984. On December 13, 2009, he was a patrol officer with the Jasper County Sheriff's Office, and was dispatched to the Gateway Motel. Captain Frame was also an evidence officer, responsible for the collection and preservation of crime-scene evidence. The Kirbyville Chief of Police asked that Captain Frame process the crime scene. Captain Frame asked Officer Jordan to assist.

Captain Frame testified that the interior of the motel room was in disarray, consistent with a struggle. He also described the duct tape he saw on one of the victim's arms. The duct tape, itself, was wrapped around the victim's right sleeve. The victim's hands were not bound together by the duct tape. Rather, it looked like they were wrapped in the victim's shirt.

At the time of trial, Robert Walker was an investigator and supervisor of criminal investigations with the Jasper County Sheriff's Office. Detective Walker had been a certified police officer since 1994. On December 13, 2009, he responded to the Gateway Motel. When he arrived, several officers were at the scene, along with a growing crowd. Walker extended the crime scene out to the highway, and took Melissa Adams to the Kirbyville's Sheriff's Office for an interview. Adams initially stated that three individuals forced her at gunpoint to rent the motel room.

Detective Walker testified he interviewed Deldrick Minter. Walker determined that the suspects were black, because another officer at the scene told him that Minter said that he saw three black males run out of the motel room around to the back of the motel.

Detective Walker interviewed Brown. Brown initially told him that he set up a sale of a hundred pounds of marihuana at Palomo's request, but that he was not present at the crime scene. Brown never said anything about a car purchase. After talking to Brown, who showed him a phone number on his cell phone that belonged to a person nicknamed "John Boy." Detective Walker developed a list of suspects. According to Brown, John Boy was involved in the drug deal. Walker had Spring locate John Boy's phone through "GPS," and was told it was at the Mariner Motel on Galveston Island. Walker then went to Galveston where Galveston Police arrested John and Kelly after they left the motel. Shane and David were also arrested in Galveston.

Kelly gave law enforcement a lead on the car that was loaned to them by David's girlfriend. The car was seized and La Marque Police Department personnel examined it. Detective Walker also collected DNA samples from appellants and Kelly and submitted them to the Texas Department of Public Safety for laboratory testing. Nothing significant was developed from the search of the Gold SUV or from the clothing appellants were wearing when they were arrested. According to Detective Walker, Shan's clothes had blood on them; however, he did not receive any DNA test results concerning the blood.

On cross examination, when asked specifically what physical evidence was collected to show a conspiracy to commit robbery, Detective Walker could not think of any. There was no physical evidence of drugs or a large amount of money having been at the motel.

On re-direct examination, Detective Walker affirmed that a twenty-dollar bill with the victim's blood on it was found in the motel room. The victim was severely beaten, duct taped, had his pants pulled down to his ankles, and his pockets were emptied. He [did] not [have[ a bit of change on him, not even the key to the motel room left in his pockets. The victim was shot and three people were seen running out of the room. There was evidence that two guns and duct tape were used in the offense. Detective Walker believed this was evidence of a robbery.

Detective Walker testified that the evidence against John, Shane, and David also included Kelly placing them at the motel at the time of the killing. Kelly told him that on the trip back to Galveston, appellants threw out their clothing in Call. Walker searched for the clothing, but did not find any.

Ginger Eastham is a forensic firearm and tool-mark examiner for the Texas Department of Public Safety, Tyler Regional Crime Laboratory. She examined the two bullets recovered during Palomo's autopsy to determine their caliber designation and possible firearms that may have fired those bullets. Eastham explained that one lead bullet was consistent with a .22 caliber and the other brass jacketed bullets was consistent with a .38 caliber of a 9mm Luger. Her analysis confirmed the two bulllets were fired from two different weapons. The bullets were admitted as State's Exhibit 57. Eastham's report was admitted as State's Exhibit 58.

Through cross examination, Eastham explained that possible firearms that could have shot the .22 caliber bullet included pistols, revolvers, and rifles, and that possible firearms that could have shot the 9mm-caliber bullet included only handguns and pistols.

Mark Wild testified he has been a latent print examiner with the Texas Department of Public Safety Austin Crime Laboratory since 2001. As a latent fingerprint examiner, he uses physical and chemical methods to process evidence for latent fingerprints. He compares any developed prints to known sets of fingerprints to determine if the came from the same source. As part of this investigation, Wild processed numerous items for potential fingerprint evidence. Of the items submitted, Wild was only able to develop a usable, comparable latent fingerprint on the Doritos bag that was collected from the bathroom of the motel room.

Wild explained that he used superglue fuming and fluorescent dye staining to develop any latent fingerprints present on the Doritos bag. He then compared the latent fingerprint developed on the bag to the known fingerprints of appellants, Kelly, and Palomo. Wild identified the latent fingerprint on the Doritos bag as the right ring finger of David. The trial court admitted State's Exhibit 60, the Doritors bag, and State's Exhibit 59, Wild's report, into evidence without objection.

At the time of trial, Andrew McWhorter was the Manager for the DNA Section at the Texas Department of Public Safety Crime Laboratory in Houston. He received buccal or "cheek" swabs that were taken from appellants and Kelly. He processed and developed DNA profiles from those buccal swabs to generate known profiles for comparison to any evidentiary profiles that might be developed in the investigation. McWhorter identified State's Exhibit 66 as his report, dated October 28, 2010, analyzing the buccal swabs. On January 28, 2011, McWhorter received several other swabs and items for analysis. He identified State's Exhibit 67 as his supplemental report detailing his analysis of these various items.

As detailed in his report, McWhorter testified that the DNA profile developed from the twenty-dollar bill recovered from the motel room was consistent with the DNA profile of the victim, Palomo, and, to a reasonable degree of scientific certainty, Palomo was the source of the DNA on the twenty-dollar bill. He also analyzed a swab from the mouth of the soda can recovered from the motel. McWhorter stated that this DNA profile was consistent with David at all 16 locations, and, to a reasonable degree of scientific certainty, David was the source of the major component of this DNA profile. McWhorter also stated that there was a portion of this DNA profile that was consistent with John's profile.

On cross-examination, McWhorter admitted that the portion of the profile that was consistent with John was a relatively common marker and that one in nine African Americans and one in forty-two Caucasion persons have this marker. He could not testify to any reasonable degree of scientific certainty that John contributed to that DNA profile.

## Grounds for Review

Petitioner asserts the following grounds for review: (1) he was denied his right to a speedy (2) he was denied due process because he was tried before a biased judge; (3) the prosecutor's closing argument was improper; (4) the trial court improperly allowed the jury to determine whether Jason Brown was an accomplice; (5) there was insufficient evidence of robbery; (6) there was insufficient evidence to show petitioner was present at the scene of the crime; (7) he received ineffective assistance of counsel at trial when counsel: (a) failed to file a motion to sever and (b) failed to object to an unredacted letter offered into evidence against a co-defendant and (8) he received ineffective assistance of counsel on appeal because: (a) counsel failed to raise a claim challenging the trial court's deadly weapon finding and (b) appellate counsel was subject to a conflict of interest because he was also trial counsel.

## Standard of Review

Title 28 U.S.C. § 2254 authorizes a district court to entertain a petition for writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment if the prisoner is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). The court may not grant relief on any claim that was adjudicated in state court proceedings unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision based on an unreasonable

determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if the state court reaches a conclusion opposite to a decision reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). An application of clearly established federal law is unreasonable if the state court identifies the correct governing legal principle, but unreasonably applies that principle to the facts. *Id*. An unreasonable application of law differs from an incorrect application; thus, a federal habeas court may correct what it finds to be an incorrect application of law only if this application is also objectively unreasonable. *Id*. at 409-411. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) (citation omitted). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. The Supreme Court has noted that this standard is difficult to meet "because it was meant to be." *Id*.

In addition, this court must accept as correct any factual determination made by the state courts unless the presumption of correctness is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e). The presumption of correctness applies to both implicit and explicit factual findings. *See Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004); *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001) ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.").

<u>Analysis</u>

*Denial of Right to Speedy Trial*

Initially, petitioner asserts he was denied his right to a speedy trial. He contends the state courts incorrectly balanced the relevant factors and applied the applicable test unreasonably. Petitioner asserts the state courts offered no reason for the two year delay in bringing him to trial and

states he suffered prejudice because he was unable to locate a witness.

The Supreme Court has identified four factors that must be balanced when evaluating speedy trial claims: (1) length of the delay; (2) reason for the delay; (3) the defendant's diligence in asserting his rights and (4) prejudice to the defendant caused by the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

The *Barker* analysis "eschews rigid rules and mechanical factor-counting in favor of a difficult and sensitive balancing process." *Amos v. Thornton*, 646 F.3d 199, 205 (5th Cir. 2011). On habeas review, a federal court must "give the widest of latitude to a state court's conduct of its speedy-trial analysis." *Id*. As long as there is any objectively reasonable basis on which the state court could have denied relief, the decision of the state court must be respected. *Id*.

"A defendant's speedy-trial right attaches at the time of arrest or indictment, whichever comes first." *Amos*, 646 F.3d at 206. "The bare minimum required to trigger a *Barker* analysis is one year." *Id*. If that element is met, the extent to which the delay extended beyond the minimum is examined because "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Goodrum v. Quarterman*, 547 F.3d 249, 258 (5th Cr. 2008).

Under the second *Barker* factor, the reasons for the delay are examined. The burden is on the respondent to proffer reasons to justify the delay. *Amos*, 646 F.3d at 207. "The weight assigned to a state's reasons for post-accusation delay depends on the reasons proffered." *Goodrum*, 547 F.3d at 258. "[A] deliberate delay to disadvantage the defense is heavily weighted against the state." *Id*. "[D]elays explained by valid reasons or attributable to the conduct of the defendant weigh in favor of the state." *Id*. A state may not be charged with delays caused by a defendant's counsel. *Vermont v. Brillon*, 556 U.S. 81 (2009). "[U]nexplained or negligent delays ... weigh against the state, but not heavily. *Id*.

In considering the third *Barker* factor, courts ask whether a petitioner diligently asserted his right to a speedy trial. *Amos*, 646 F.3d at 207. A petitioner's assertion of his right "receives strong evidentiary weight, while failure to assert the right will make it difficult for a defendant to prove that

he was denied a speedy trial." *Id*.

Under the fourth *Barker* prong, unless the first three factors weigh heavily in favor of the defendant or the delay is at least five years, the burden is on the petitioner to put forth evidence of actual prejudice. *Divers v. Cain*, 698 F.3d 211, 219 (5th Cir. 2012). As the delay in this case was shorter than five years and the first three factors do not weigh heavily in favor of petitioner, he has the burden to show prejudice. In considering the prejudice element, courts are to bear in mind the factors meant to be protected by a speedy trial: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. The third interest is "the most serious ... because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*.

Petitioner raised this ground for review on direct appeal. In finding petitioner was not denied his right to a speedy trial, the intermediate appellate court stated as follows:

> In this case, Shane was arrested on or about December 15, 2009, and was unable to post bond. The indictment was filed February 23, 2010. On June 23, 2011, Shane filed a motion for a speedy trial. On October 13, 2011, the trial court held a hearing on the motion and denied it. At the hearing, defense counsel argued that Shane would be "honored" to have an October 17, 2011, trial date and asked for trial to commence on that date. Trial commenced on December 11, 2011, nearly two years after the murder. The record reflects that he remained incarcerated in the Jasper County Jail between his arrest and his trial in December, 2011. Because we conclude, for the same of argument only, the delay in Shane's trial is presumptively prejudicial, we address the remaining three factors.

> The clerk's record shows, and Shane's counsel acknowledged at the speedy-trial hearing, that defendant counsel sought a continuance of a docket call on April 1, 2010, because counsel needed to appear in another court. As a result, the docket call was rescheduled for May 6, 2010. At the speedy-trial hearing, although the parties focused on the length of the delay, the State did not present any explanation. That alone, however, is not dispositive of the speedy-trial claim. Though we find the period of substantial delay is unexcused because it is unexplained, we must consider it in light of other circumstances, such as prejudice, to determine whether the delay requires dismissal of the case.

> Shane was incarcerated for over a year before he filed his speedy-trial motion on June 23, 2011. At the hearing held on October 13, 2011, Shane's defense counsel informed the trial court that Shane would be satisfied with an October 17, 2011, trial date. The record shows that the trial commenced less than two months thereafter. This factor weights against Shane's speedy-trial claim.

Finally, we consider whether prejudice resulted from the delay. Although the defendant need not show actual prejudice, he must make a *prima facie* showing of prejudice. The burden then shifts to the State to show the prejudice did not exceed that which occurs from the ordinary and inevitable delay.

In this case, the record contains no evidence of prejudice resulting from the delay in bringing appellant's case to trial. Accordingly, after evaluating the [relevant] subfactors, we conclude appellant suffered minimal, if any, prejudice.

We must now balance the four factors to determine whether appellant was denied his right to a speedy trial. On the one hand, the State failed to explain nearly two years of delay and offered little evidence of its diligence in trying appellant's case. On the other hand, appellant indicated through his counsel that he would be satisfied with an October 17, 2011, trial date. The trial commenced less than two months later, and appellant offered no evidence of prejudice. After balancing these factors under the applicable standard, we find appellant was not denied his right to a speedy trial.

As its opinion demonstrates, the intermediate appellate court considered the *Barker* factors and, after balancing the factors, concluded petitioner was not denied his right to a speedy trial. After considering the court's reasoning, this court is unable to conclude that the rejection of this ground for review is contrary to, or an unreasonable application of, clearly established federal law. This is particularly true because the first three *Barker* factor do not weigh heavily in petitioner's favor and he had failed to demonstrate he suffered prejudice as a result of the delay. While petitioner asserts the delay kept him from locating a witness, he had not identified the witness or explained how the witness would have assisted his defense.

*Biased Judge*

Petitioner further contends he was denied due process of law because the trial judge was biased. Petitioner states the trial judge was retiring after his trial and states he had an interest in the outcome of the trial. He states the judge was biased, unfair, and an unreasonable finder of fact. In support of his contention, he cites the judge's: (a) admittance of a prejudicial letter into evidence; (b) denial of all pretrial motions favorable to the defense and (c) denial of a request for an instructed verdict. He also complains of search warrants issued by the judge and the denial of motions to have certain evidence excluded. He further asserts that the judge erred by not providing him with a speedy trial.

Due process requires a fair trial before judge with no actual bias or interest in the outcome of the case. *Richardson v. Quarterman*, 537 F.3d 466, 474 (5th Cir. 2008). Because of the difficulty in proving actual bias, the Due Process Clause also requires recusal if the judge is presumptively biased. *Capterton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883-84 (2009). "Presumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that 'the probability of actual bias . . . is too high to be constitutionally tolerable.'" *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 37 (1975)). The Supreme Court has found presumptive bias in three situations: (1) when the judge has a substantial interest in the outcome of the case; (2) where the judge has been the target of personal abuse or criticism from a party; or (3) if the judge has a dual role of investigating and adjudicating the dispute. *Id.* Mere disagreements as to rulings made by a judge are almost always insufficient to show bias or prejudice. *Liteky v. United States*, 510 U.S. 540, 554-55 (1994).

Petitioner complains of many of the trial judge's rulings. However, as stated above, disagreements with a trial judge's rulings do not demonstrate the judge was biased against a petitioner. In addition, petitioner has failed to show the trial judge was the target of personal criticism or abuse or had a dual role investigating and adjudicating his case. Further, while petitioner asserts in conclusory fashion that the trial judge had a interest in the outcome of his case, he has made no attempt to explain what that interest was. Finally, petitioner has not explained why the trial judge's impending retirement caused him to have a bias against petitioner. This ground for review is therefore without merit.

*Improper Jury Argument*

Petitioner also states the prosecutor acted improperly during closing argument. He states the prosecutor incorrectly told the jury about false testimony from Miesha Kelly that petitioner shot the victim in the back with an upward trajectory while he was trying to get out the window.

On direct examination, the prosecutor elicited testimony from Ms. Kelly that while they were traveling back to Galveston, petitioner stated he had shot the victim. She also stated petitioner stated he shot the victim in the back while the victim was trying to get out and jump out the window.

Petitioner also told her he thought the victim was reaching for a gun or something. In addition, the forensic pathologist who performed the autopsy stated there was a gunshot entry wound on the victim's right middle or lower back area and that the bullet traveled back to front slightly upward in direction.

During closing arguments, the prosecutor made the following statement:

> Jesse Palomo Jr. was shot in the back with an upwards trajectory. Well, the only way we know that is because Miesha said Shane told her that. And she's a co-conspirator. Remember, Miesha testified that Shane had told her that he shot Palomo in the back as he was trying to get out that window. Makes sense. Back, leaning over, upward trajectory.

> [The pathologist] in his report, finds the same thing. Right mid-lower back area, traveled in a posterior to anterior direction. And y'all remember [the pathologist] showing that on me. Lower back up. What are the odds that Meisha, who testified under oath that she had never seen or discussed the contents of this report, knew what the trajectory of that bullet would be." Amazing.

In light of the testimony given by Ms. Kelly and the report of the pathologist, the court is unable to find anything improper in the portion of the closing argument petitioner finds fault with. The argument describes the testimony of Ms. Kelly in a substantially correct fashion and did not mislead the jury as to either her testimony or the contents of the report. Nor is there anything improper in the prosecutor's attempt to explain why he believed the report of the pathologist supported her testimony. This ground for review is therefore without merit.

*Determination that Jason Brown was an Accomplice*

Petitioner also complains that the trial court improperly allowed the jury to determine whether Jason Brown was an accomplice rather determining he was an accomplice as a matter of law. Under the court's charge, if the jury determined Mr. Brown was an accomplice, it could not find petitioner guilty unless it determined there was evidence in the case outside of the testimony of Mr. Brown and any other accomplices tending to connect petitioner with the commission of the offense.[1]

---

[1] Under Section 38.14 of the Texas Code of Criminal Procedure, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed . . ."

Texas law provides an accomplice is someone who participates before, during, or after the commission of the crime alleged in the indictment. *McFarland v. State*, 928 S.W.3d 482, 514 (Tex.Crim.App. 1996). As a witness may be an accomplice either as a matter of law or as a matter of fact, the evidence in a particular case determines what jury instruction should be given. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex.Crim.App. 2006). Unless the evidence clearly shows the witness is an accomplice as a matter of law, such as when the witness was or could have been indicted for the same offense, the determination as to whether a witness is also an accomplice is properly left to the jury. *Id.* at 747-48. If conflicting or unclear evidence is presented regarding whether a witness is an accomplice, the question is to be left to the jury. *Id.* at 748.

While there was evidence Mr. Brown was involved in the planned sale of marihuana, there was little if any evidence he had any connection with the murder of the victim or knew that a murder was planned. While he did flee the scene of the crime after the victim was shot, indicating he may have been involved in the murder or knew a murder was planned, he was not in the motel room when the victim was shot. As a result, it must be concluded the evidence was unclear as to whether Mr. Brown was an accomplice to the murder. The trial court therefore did not err in allowing the jury to determine whether Mr. Brown was an accomplice. Accordingly, the rejection by the state court's of this ground for review was not contrary to, or an unreasonable determination of, clearly established federal law.

*Insufficient Evidence to Establish a Robbery was Committed*

Pursuant to Section 19.03(a)(2), in order to elevate the crime petitioner was accused of committing from murder to capital murder, the prosecution was required to prove beyond a reasonable doubt that the victim was murdered during the course of a robbery or attempted robbery. Petitioner contends the prosecution failed to prove there was a robbery or attempted robbery. He states there was no evidence any property was taken from the victim. Petitioner contends the prosecution merely used alleged weapons, hoodies, ski masks, a bloody $20 bill, a broken gold chain and duct tape to insinuate that a robbery was attempted or committed.

Claims regarding sufficiency of the evidence are governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). A federal habeas court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 319. The court may not substitute its view of the evidence for that of the jury, but must consider all of the evidence in the light most favorable to the prosecution. *Weeks v. Scott*, 55 F3d 1059, 106 (5th Cir. 1995).

Petitioner raised this ground for review on direct appeal. In finding there was sufficient evidence that the murder was convicted during the course of a robbery or attempted robbery, the intermediate appellate court stated as follows:

> Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. In [this] case, a hypothetically correct jury charge would state that [petitioner] is guilty of capital murder as alleged in the indictment if he (1) intentionally committed the murder of Palomo (2) in the course of committing or attempting to commit robbery. As defined by a hypothetically correct jury charge, a robbery occurs when, in the course of committing theft and with intent to obtain or maintain control of [another person's] property, a person (1) intentionally, knowingly, or recklessly, causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of bodily injury or death. A person commits theft if he unlawfully appropriates property with intent to deprive the owner of the property. However, "[n]o completed theft is required in order for the proscribed conduct to constitute the offense of robbery."

> The jury was instructed on the law of parties, which states that a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." When we review the sufficiency of the evidence supporting a defendant's participation as a party to the crime, "we may consider 'events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'"

> In *McKinney v. State*, the First Court of Appeals held that the evidence was legally sufficient to support a finding that a defendant committed capital murder while acting as a principal or party to attempted burglary or attempted or actual robbery. The evidence showed the defendant knowingly drove to the home of a drug dealer who had significant amounts of money and drugs. The defendant and his co-actor brought guns with them to the drug dealer's home, intentionally shot victims at the home, and

in a statement, the defendant stated he saw his co-actor grab one victim by the hair, point a gun at her, and demand to know the location of valuables. The appellate court concluded this was sufficient evidence to show the defendant acted as a principal or party to the offense of attempted burglary or attempted or actual robbery.

In *Slomba v. State*, the Sixth Court of Appeals held that sufficient circumstantial evidence showed defendant attempted to rob a bank employee. In *Slomba*, the defendant was dressed in black clothing when he charged at a bank employee as she unlocked the bank. Although the employee managed to enter the bank and lock the door, leaving defendant outside, defendant was found within minutes, crouching near a building with a loaded pistol, a bag, and a black mask or hood. The appellate court explained the defendant's acts toward the employee showed the intent to use force or obtain or maintain control of property and the items found in his possession also supported an inference the defendant intended to commit a robbery.

In this case, as in *McKinney*, the evidence showed appellants brought firearms to meet a drug dealer, Palomo, who could provide a significant amount of drugs, worth at least $30,000. In addition, appellants brought duct tape, a large nylon bag, mask and/or hoodies, and rubber gloves to their meeting with Palomo. These items showed intent to commit robbery.

As revealed by the autopsy report, prior to shooting Palomo, appellants caused sever blunt-force trauma to his head. Palomo was bound with duct tape, his pockets were emptied, and his twenty-dollar bill was left on the floor. A small broken piece of a gold chain was also found in the parking lot right outside the motel room. While the middleman, Brown, testified the plan was for appellants to purchase drugs from Palomo at the motel room, Kelly testified that David and John told her their purpose in going to the motel was to obtain a car and marihuana. According to Kelly, she left all three appellants at the Gateway Motel, hours from their hometown of Galveston, without transportation.

After Palomo crashed through the motel room window, appellants fled the scene and hid behind the hotel waiting for Kelly to come back and drive them to Galveston. Shane threatened Kelly and told her to keep going when law enforcement vehicles with activated sirens neared them as they drove away from Kirbyville. John had blood on his mouth after the incident. John and David threw their undershirts out of the SUV as Kelly drove. Shane and David discussed the shooting in the SUV as Kelly drove the three appellants back to Galveston. John appeared nervous after the murder and Kelly saw him give Shane a small gun which Shane handled with gloves. After appellants returned to Galveston, John apologized to Kelly and had a woman rent a motel room for them, rather than staying in their own home. After his arrest, John wrote Kelly letters from jail telling her to "keep her mouth shut" about the location where the guns were hidden, and that "Dumb" had hidden the guns in "the spot," but had not thrown them in a body of water.

A "consciousness of guilt" is perhaps one of the strongest kinds of evidence of guilt." "It is consequently a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged. In this case, appellant's flight from Kirbyville, instructions not to pull over when passed by police officers with their lights and sirens on, and John's decision to hide in a hotel, support an inference that appellants

sought to evade arrest because they are guilty of the charged offense.

> Viewing all the evidence in a light most favorable to the verdict, we conclude it allowed a reasonable trial of fact to find that each appellant, as a principal or as a party, intentionally committed the murder of Palomo in the course of committing or attempting to commit a robbery of Palomo.

After identifying the correct legal standard, the intermediate appellate court thoroughly reviewed the evidence and concluded a reasonable finder of fact found have found beyond a reasonable doubt that petitioner, either as a principal or a party, murdered the victim while robbing him or attempting to rob him. While the evidence regarding the robbery was largely circumstantial, the court agrees it was more than sufficient to permit the jury to make the required finding. This ground for review is therefore without merit.

*Insufficient Evidence to Determine Petitioner was Present at the Scene of the Crime*

Petitioner further contends there was no evidence presented, other than the uncorroborated testimony of accomplices, to connect petitioner to the crime or the crime scene. He states there is no evidence he was in the gold SUV that allegedly transported his brother to the scene of the crime, only testimony from co-defendants who had something to gain by lying. He states there is no DNA or fingerprint evidence. Nor was there any identification of him from any outside witnesses.

Petitioner also asserted this ground for review on direct appeal. The intermediate appellate court initially observed that under Texas law a conviction could not be based solely upon the testimony of an accomplice unless there was corroborating evidence tending to connect the defendant with the crime. The court then stated as follows:

> After eliminating the accomplice-witness testimony of Kelly, Adams, and Brown, from our consideration and conducting an examination of the non-accomplice evidence, we conclude that considering the combined force of all the non-accomplice evidence that tends to connect . . . Shane to the offense, the non-accomplice evidence sufficiently corroborates the testimony of the accomplice witnesses, and shows [his] presence at the crime scene at the time of the murder. The non-accomplice evidence that tends to connect . . . Shane to the crime scene at the time of the murder can be summarized as follows:

> Consistent with Kelly and Brown's accomplice testimony placing appellants in the Gateway motel room at the time of the murder, the day of the offense, Minter told law enforcement he saw three black males run out of the Gateway Motel room.

According to Minter's trial testimony, it was after he saw Palomo crash through the motel room window, that he saw these individuals with hoodies run out of the Gateway Motel room.

Wagner saw three "guys" or individuals run out of the motel room wearing "black hoodies with black masks over their faces."

Consistent with Kelly's testimony about where she picked up appellants, Mintor told law enforcement he saw these males run around to the back of the motel.

Wagner testified the three individuals went to the left and behind the motel.

Consistent with Brown's testimony that the "guys" who exited the motel room had pistols, according to Eastham's testimony, at least one of the weapons used to shoot Palomo was necessarily a hand gun or pistol and the other weapon was a pistol, revolver or rifle.

Consistent with Kelly's testimony that Shane and John had two small guns she saw when they returned to Galveston, Eastham testified the two bullets recovered during Palomo's autopsy were fired from two separate guns.

Consistent with Kelly's testimony that she observed Shane wearing gloves when he handled the guns, a rubber glove was found at the crime scene and according to Wild's testimony, little fingerprint evidence was obtained at the crime scene.

John and Shane were arrested in Galveston, consistent with Kelly's testimony they returned to Galveston after the offense.

The crime scene was bloody and, according to Detective Walker's testimony, at the time of his arrest in Galveston, Shane's clothes appeared to have a lot of blood on them.

Consistent with Kelly's testimony that during the drive back to Galveston, Shane talked about using duct tape during the offense and having shot Palomo in the back before Palomo fell through the window, duct tape was found at the crime scene and the autopsy revealed Palomo was shot in the back before he fell through the window.

The non-accomplice evidence described by the intermediate appellate court was more than sufficient to permit the jury to conclude petitioner was present at the crime scene and to find each essential element of the offense of capital murder to be proven beyond a reasonable doubt. The rejection of this ground for review by the state courts was therefore not contrary to, or an unreasonable application of, clearly established federal law.

*Ineffective Assistance of Counsel at Trial*

A. <u>Legal Standard</u>

In order to establish an ineffective assistance of counsel claim, a petitioner must prove counsel's performance was deficient, and that the deficient performance prejudiced petitioner's defense. *Strickland v. Washington*, 466 U.S. 668 (1984). As a petitioner must prove both deficient performance and prejudice, failure to prove either will be fatal to his claim. *Johnson v. Scott*, 68 F.3d 106, 109 (5th Cir. 1995).

Judicial review of counsel's performance is highly deferential. *Strickland*, 466 U.S. at 689. There is a strong presumption counsel rendered reasonable, professional assistance and that the challenged conduct was the result of a reasoned strategy. *Id*.; *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). To overcome the presumption that counsel provided reasonably effective assistance, a petitioner must prove counsel's performance was objectively unreasonable in light of the facts of the case. *Strickland*, 466 U.S. at 689-90. A reasonable professional judgment to pursue a certain strategy should not be second-guessed. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).

In addition to demonstrating counsel's performance was deficient, a petitioner must also show prejudice resulting from the inadequate performance. *Strickland*, 466 U.S. at 691-92. A petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A petitioner must show a substantial likelihood that the result would have been different if counsel had performed competently. *Harrington v. Richter*, 131 S.Ct. 770, 791 (2011). Mere allegations of prejudice are insufficient; a petitioner must affirmatively prove, by a preponderance of the evidence, that he was prejudiced due to counsel's deficient performance. *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994).

Analysis of an ineffective assistance claim on federal habeas review of a state court conviction is not the same as adjudicating the claim on direct review of a federal conviction.

*Ritcher*, 131 S.Ct. at 785. The key question on habeas review is not whether counsel's performance fell below the *Strickland* standard, but whether the state court's application of *Strickland* was unreasonable. *Id*. Even if a petitioner has a strong case for granting relief, that does not mean the state court was unreasonable in denying relief. *Id*.

    B. <u>Application</u>

    1. <u>Failure to Attempt to Have Petitioner's Trial Severed</u>

    Initially, petitioner faults counsel for failing to attempt to have his trial severed from the trial of both of his co-defendants. He states counsel knew that there was evidence against both co-defendant that, if admitted at his trial, would deny petitioner a fair trial. Petitioner states counsel knew all three defendants had prior felony convictions, but only attempted to have his trial severed from that of co-defendant Haywood.

    In connection with petitioner's state application for writ of habeas corpus, trial counsel submitted an affidavit. With respect to the severance issue, counsel stated as follows:

> Applicant alleges that I "failed to file a motion to sever thereby allowing the admittance of evidence that would be prejudicial to Applicant if tried along with his co-defendants." On November 28, 2011, a motion to sever was filed in this case to sever co-defendant David Lewis Haywood. This motion was denied by the trial court on December 1, 2011. I did not file a motion to sever on co-defendant John Matthews. Applicant and John Matthews both had a previous admissible conviction. Additionally, John Matthews never indicated himself, or through his counsel, that he would be testifying against Applicant. I and Applicant were aware of John Matthews' letters to Miesha Kelly and the contents therein, however because of my understanding of the general rule on severance at that time being, that except in the instance where one defendant does not have any admissible prior convictions, and the other defendant does, there is no absolute right to a severance prior to trial.

The state habeas trial court issued the following findings of fact:

> 6. Applicant's counsel filed a motion to sever co-defendant David Lewis Haywood on November 28, 2011, on the theory that Haywood made statements incriminating Matthew, and a joint trial would deny Applicant his right of confrontation and cross examination. The Motion was denied on December 1, 2011.

> 7. According to his affidavit, Counsel did not file a motion to sever co-defendant John Matthews because Applicant and John Matthews both had a previous admissible conviction.

> 8. State's Exhibit 64 was admitted into evidence through Captain Gerald Hall, of the City of Jasper Police Department. Captain Hall testified that in his opinion the

exhibit was written by John Matthews.

9. Applicant's name was not mentioned in State's Exhibit 64.

10. Meisha Kelly testified that she was the recipient of State's Exhibit 64. In State's Exhibit 64, John Matthews wrote that he hoped Kelly had not said anything about the "spot," because that is where "dumb took the tools, not swimming." Kelly testified that John's reference to the "tools" was about guns, and the "spot" was a place where John and Shane hung out. When asked if she knew anyone named "dumb," Kelly's answer was no.

11. There are no redacting instructions in the Order on the State's Motion to Try Defendant's Jointly.

12. Trial counsel reviewed State's Exhibit 64 prior to trial.

13. Trial counsel demonstrated a competent understanding of the law regarding severance.

14. Applicant has not demonstrate that trial Counsel's failure to file a motion to sever co-defendant John Matthews resulted in evidence being admitted that was prejudicial to Applicant. Any possible incriminating reference to Applicant in relation to the "spot" or the "tools" was elicited through the testimony of Meisha Kelly, not from the contends of Exhibit 64 itself. Applicant's attorney had the opportunity to cross examine Meisha Kelly.

The state habeas trial court also issued the following conclusion of law:

Applicant's trial counsel did not fall below an objective standard of reasonableness. His explanation for not filing a motion to sever co-defendant John Matthews supports a reasonable trial strategy in light of his knowledge of the law regarding severance and his knowledge of the contents of State's Exhibit 64. Trial counsel did not fail to follow any redacting instructions, as there were no such instructions in the Trial Court's Order regarding joinder. Trial Counsel's performance was not deficient.

Under Article 36.09 of the Texas Code of Criminal Procedure, severance is not required where, as with respect to petitioner and his brother John, both defendants have prior convictions admissible at either stage of a bifurcated proceeding. Where both defendants have prior admissible convictions, a request for severance must be based on the contention that a joint trial would be prejudicial. *Rivera v. State*, 405 S.W.3d 729, 735 (Tex.App.-Houston[1st Dist.] 2013). Even the use of antagonistic defenses are not necessarily sufficient to require severance. *Qualley v. State*, 206 S.W.3d 624, 636 (Tex.Crim.App. 2006).

Petitioner and his brother did not assert inconsistent or antagonistic defenses at trial. Nor has petitioner demonstrated that any inculpatory evidence introduced against during trial would have

26

been inadmissible if he had been tried separately. It seems likely that the main piece of inculpatory evidence petitioner believes could not have been introduced against him at a separate trial, Exhibit 64, a letter from petitioner's brother to Ms. Kelly, would have been admissible at a separate trial. However, even if this exhibit would have been excluded from a separate trial, as the letter does not mention petitioner's name or even refer to him, there is not a reasonable probability petitioner would have been acquitted if the letter had not been introduced during the joint trial.

For the reasons set forth above, it is unlikely the court would have granted a severance motion. The failure to make such a motion therefore did not fall below an objective standard of reasonableness and did not cause petitioner to suffer prejudice, particularly as the only piece of evidence that might possibly not have been admitted at a separate trial did not include petitioner's name or refer to him. This ground for review is therefore without merit.

2. Failure to Object to Introduction of Unredacted Letter into Evidence

Petitioner states his attorney should objected to the admission of Exhibit 64, which has been described above, or attempted to have the exhibit redacted.

With respect to this issue, counsel stated in his affidavit as follows:

Applicant alleges that I "failed to object to a letter (State's Exhibit #64) without redacting instructions concerning Applicant's co-defendants." Considering that all three defendants were tried jointly by the same jury, it would have been impossible to redact the statements about Applicant without the same jury hearing the redacted statements when offered against John Matthews.

Petitioner has not identified a sufficient basis for counsel to have argued for exclusion or redaction of Exhibit 64. Counsel's failure to make such an argument therefore did not fall below an objective standard of reasonableness. Moreover, as explained above, there is not a reasonable probability petitioner would have been acquitted if the exhibit had been excluded or redacted. Accordingly, petitioner did not suffer prejudice as a result of the exhibit not being excluded or redacted.

*Ineffective Assistance of Counsel on Appeal*

A.  Failure to Challenge Deadly Weapon Finding

Petitioner faults appellate counsel for failing to raise grounds that had a better chance for relief and failing to challenge the trial court's finding that a deadly weapon was involved in the offense.  Petitioner states counsel should have argued that the court should have asked the jury to determine whether he used or exhibited a deadly weapon.

Under Texas law, the court may enter a deadly weapon finding where the jury has: (1) found a defendant guilty as alleged in the indictment and a deadly weapon was specifically pled as being involved in the offense; (2) found a defendant guilty as alleged in the indictment and while a deadly weapon was not specifically identified in the indictment as being a deadly weapon, the weapon identified in the indictment is *per se* a deadly weapon; or (3) affirmatively answered a special issue regarding a deadly weapon having been used in the offense.  *Lafluer v. State*, 106 S.W. 3d 91, 102 (Tex.Crim.App. 2003).

In this case, the indictment alleged the offense was committed through the use of a firearm. Under Section 107(a)(17)(A) of the Texas Penal Code, a firearm is a deadly weapon *per se*.  The jury was asked to determine whether petitioner committed murder with a weapon.  Accordingly, once the jury found petitioner guilty of the capital murder as alleged in the indictment, Texas law authorized the trial court to enter a deadly weapon finding.   An assertion on appeal that the trial court acted improperly by making such a finding would therefore have been without merit.  As a result, appellate counsel's failure to make such an argument did not fall below an objective standard of reasonableness and did not cause petitioner to suffer prejudice.  Nor has petitioner identified any additional meritorious grounds for review appellate counsel should have raised.  This ground for review is therefore without merit.

B.  Conflict of Interest

Finally, petitioner asserts appellate counsel was subject to an improper conflict of interest because he also represented petitioner at trial.  He contends this conflict prevented counsel from

asserting he had made errors while representing petitioner during trial.

Initially, it is observed that under Texas law, a direct appeal is not the preferred method of challenging the effectiveness of trial counsel. *Rylander v.* State, 101 S.W.3d 107, 110 (Tex.Crim. App. 2003); *Thompson v. State*, 9 S.W.3d 808, 813 n.5 (Tex.Crim. App. 1999). The reason for this is that the record on direct appeal concerning counsel's representation is often underdeveloped. *Rylander*, 101 S.W.3d at 110.

As Texas provides that a direct appeal is not the preferred method of challenging the effectiveness of trial counsel, it cannot be concluded petitioner suffered prejudice because his trial counsel also represented him on appeal. Moreover, outside of asserting that counsel's conflict of interest prevented him from asserting he was ineffective for failing to object to the admission of Exhibit 64 and failing to assert certain unidentified motions should have been filed, petitioner has not identified any grounds for review counsel's alleged conflict prevented him from raising. The court has previously concluded trial counsel's failure to object to the admission of Exhibit 64 did not constitute ineffective assistance. Further, as petitioner has not identified what motions trial counsel should have filed, it cannot be concluded petitioner suffered prejudice as a result of the motions not being filed.

Petitioner has not demonstrated he suffered prejudice as a result of an alleged conflict of interest on the part of counsel. As a result, this ground for review does not provide him with a basis for relief.

Conclusion

For the reasons set forth above, this petition for writ of habeas corpus is without merit. A final judgment denying the petition shall be entered.

In addition, the court is of the opinion petitioner is not entitled to a certificate of appealability. An appeal from a judgment denying federal habeas relief may not proceed unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253. The standard for a certificate of apppealability requires a petitioner to make a substantial showing of the denial of a federal

constitutional right.  *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Elizalde v. Dretke*, 362 F.3d 323, 328 (5th Cir. 2004).  To make a substantial showing, the petitioner need not establish that he would prevail on the merits.  Rather, he must demonstrate that the issues are subject to debate among jurists of reason, that a court could resolve the issues in a different manner, or that the questions presented are worthy of encouragement to proceed further.  *See Slack*, 529 U.S. at 483-84. Any doubt regarding whether to grant a certificate of appealability should be resolved in favor of the petitioner.  *See Miller v. Johnson*, 200 F.3d 272, 280-81 (5th Cir. 2000).

For the reasons set forth above, petitioner has not made a substantial showing of the denial of a constitutional right.  As a result, a certificate of appealability shall not issue in this matter.

**SIGNED** this the 27 day of **September, 2018.**

Thad Heartfield
United States District Judge